THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ELAINE TINGLEY,** | : | |
| | : | |
| **Plaintiff,** | : | **3:23-CV-01698** |
| | : | **(JUDGE MARIANI)** |
| **v.** | : | |
| | : | |
| **SHEETZ, INC.** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

On October 12, 2023, Plaintiff Elaine Tingley ("Plaintiff" or "Tingley") brought suit

against her former employer, Defendant Sheetz Inc. ("Defendant" or "Sheetz"), alleging age

discrimination in violation Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*

("ADEA") and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA").

(Doc. 1). Presently before the Court is Defendant's motion for summary judgment. (Doc.

19). For the reasons that follow, Defendant's motion will be denied.

### I.   STATEMENT OF FACTS

On December 13, 2024, Defendant filed a motion for summary judgment as well as a

statement of material facts ("SOMF").[1] (Doc. 21). The following facts are undisputed,

unless otherwise noted:

---

[1]   Plaintiff filed an answer to the Defendant's statement of material facts, (Doc. 25), which the Court
will refer to as "PSOMF."

Sheetz is a family-owned convenience store chain based in Altoona, Pennsylvania. (SOMF at ¶ 1). Sheetz's Employee Handbook outlines Sheetz's Professionalism and Respect Policy, Harassment and Discrimination Policy, and Progressive Discipline Policy. (*Id.* at ¶ 3).[2] Plaintiff was employed by Sheetz at Store #363 located in Clarks Summit, Pennsylvania from February 2016 until her termination in February 2023. (*Id.* at ¶ 4). At all times during her employment with Sheetz, Tingley was employed as a Cashier/Salesperson. (*Id.* at ¶ 5). Tingley's job duties and responsibilities included stocking the front end of the store with products, selling items, completing register transactions, and working as part of the store term to engage customers with hospitality and friendliness in all aspects of their experience at Sheetz. (*Id.* at ¶ 6). At the time of her termination, Tingley reported to Store Manager Alicia Phillips ("Phillips"). (*Id.* at ¶ 8). At the time of Tingley's termination, Phillips reported to District Manager Jessica Sowansky ("Sowansky"). (*Id.* at ¶ 9).

Prior to issuing discipline for performance issues, Sheetz typically provides less formal coaching and feedback through a documented conversation to address concerns with employees, which is called a "Strive" warning or coaching.[3] Strive coachings are documented in Sheetz's Annual Performance Review software, and can be referred to as

---

[2]     Tingley acknowledged receipt of Sheetz's Employee Handbook upon her hire, and agreed she was "responsible for familiarizing [herself] with its contents." (SOMF at ¶ 7).

[3]     Plaintiff denies this statement of fact and cites to specific parts of the record to support her denial. (PSOMF at ¶ 10).

"training" at times.[4]  Sheetz maintains a Progressive Discipline policy, though it explicitly

reserves the right to "combine and/or skip steps in the progressive discipline process

depending on the circumstances of each situation and the nature and severity of the

offense." (*Id.* at ¶ 12).  The Progressive Discipline policy further states that, "[e]mployees

may be terminated without prior notice or disciplinary action." (*Id.* at ¶ 13).  Discipline

remains current for one year following issuance, and is no longer considered after one year

following the issuance. (*Id.* at ¶ 14).  During her employment with Sheetz, Tingley was

disciplined on several occasions.[5] (*Id* at ¶ 15).  On April 12, 2016, Tingley was issued a

written Disciplinary Notice for failing to follow proper process and procedure for restricted

sale items after she failed to check the identification of a customer who was purchasing a

lighter.[6] (*Id.* at ¶ 16).  Tingley was informed in this Notice that "[f]urther violations of

company policy and/or unsatisfactory conduct or performance may be grounds for additional

---

[4]      Plaintiff denies this statement of fact and cites to specific parts of the record to support her denial. (PSOMF at ¶ 11).

[5]      Although Plaintiff denies this statement of fact and states that it is not material to her termination, (PSOMF at ¶ 15), her deposition testimony demonstrates that she was disciplined by Sheetz on more than one occasion. (*See* Doc 22-2 at 67:21-68:7) ("Q: Okay. So did you receive discipline in the form of training at some point during your employment with Sheetz? A: Yes. Q: And when was that? A: I can't recall the exact dates. Q: Okay. How many times? A: I can't – I don't remember. Q: More than once.? A: Yes. Q: More than five times? A: I don't think so.").

[6]      Plaintiff purports to admit and deny this statement of fact. (PSOMF at ¶ 16). However, the Court will treat Plaintiff's answer as an admission of this fact. *See id.* ("Admitted in part. Denied in part. . . . although the referenced event occurred, it is not material to plaintiff's termination."). For the same reasons, the Court will treat Plaintiff's answer to SOMF at ¶ 17 as admitted. (*See* PSOMF at ¶ 17) ("Admitted in part. Denied in part. While it is admitted the notice exists and states as quoted, it is not material to plaintiff's termination in 2023. . . .").

disciplinary action, up to and including termination." (*Id.* at ¶ 17).  Tingley signed the April

12, 2016 Disciplinary Notice.  (*Id.* at ¶ 18).  She did not complain about the Notice or feel

that it was discriminatory.  (*Id.* at ¶ 19).

On December 19, 2017, Tingley received a written Coaching Session for poor job

performance—specifically, unprofessional behavior when she "kept arguing with a customer

while the [manager on duty] was trying to resolve the situation."[7]  (*Id.* at ¶ 20).  Tingley was

informed during the December 19, 2017, Coaching Session that "[f]urther violations of

company policy and/or unsatisfactory conduct or performance may be grounds for additional

disciplinary action, up to and including termination." (*Id.* at ¶ 21).  Tingley signed the

December 19, 2017, Coaching Session.  (*Id.* at ¶ 22).  Tingley did not complain about the

Coaching Session or feel that it was discriminatory.  (*Id.* at ¶ 23).

On or about November 9, 2022, Sheetz received an anonymous complaint regarding

Tingley through its employee hotline, which is managed by a third-party vendor ("2022

Hotline Complaint").[8]  (*Id.* at ¶ 24).  Specifically, the complainant who made the 2022 Hotline

Complaint asserted:

---

[7]     Plaintiff, again, purports to admit and deny this statement of fact.  (PSOMF at ¶ 20).  However, the Court will treat this statement as an admission.  *See id.* ("Admitted in Part.  Denied in part.  The notice is not material to plaintiff's termination in 2023. . . .").

[8]     Plaintiff denies this statement "as stated," and further claims the facts alleged in the paragraph are based upon hearsay and may not be considered on summary judgment.  (PSOMF ¶ 24).  As set forth in the Scheduling Order, this is an improper statement.  (*See* Doc. 11 at 4 n.1) ("If a party files a motion for summary judgment, the only permitted responses by the non-moving party to the moving party's statement of material facts are: "admitted", "denied", or "admitted in part and denied in part.  **No response by the non-moving party to a movant's statement of material fact which purports to be a denial of an**

Elaine has been a constant thorn in this stores side. I am in management in this store, and have witness [sic] a lot of behaviors that constitute intimidating others, both employees and customers. This women is hateful, scornful, and her morals are consistent harassment to those around her. I am afraid to identify myself on a store level, because I do not want to become her target. I witness the way she has driven away and segregated workers from our store.

Tuesday Nov 8th, she was caught telling workers that "Dayshift" does no work around the store. These kinds of comments are hurtful to the staff and offend workers who show up and give it there [sic] all daily. Last week an employee who recently transferred stores because he was being bullied by Elaine and Willow, stopped in for a visit, and Elaine just about went off her rocker stating "He has no business stopping in here, he has his own store." She was clearly very upset and angered by his visit. Managers across the board knew of his reason for transfer, and like usual nothing was addressed or changed. Another good worker gone! This needs to stop already. PLEASE help us!

All managers across the board, are aware of just how toxic she is to the nature of the store. Some care, some could care less. People seem afraid to discipline her. There are complaints filed by customers for as long as I have been there. There are also statements written about her by fellow employees but I cannot tell if they ever make it past the gatekeeper as she has her protectors.

The first week of November Elaine was waiting on a customer, when the girl she was working next to chimed up to try and assist the customer because like usual Elaine was short with them, and the young girl felt bad, Elaine immediately got loud with the girl, and aggressively said to her "Do not speak over me again!" She was then giving the poor girl the death stair [sic] for the remainder of her shift to intimidate her. This is a common trait and behavior of hers in reality.

The previous guy BJ who she drove away, was a very positive employee, easygoing. Elaine targeted him, and got him fed up enough he choose to transfer out. The following day when she reported for her shift, she openly called out to the staff "It's so nice and peaceful in here today finally isn't it? Don't you all just love the quiet?" It was another example of her showing her. "Win," without any regard to those of us who enjoyed working beside BJ. So inappropriate. I too cannot wait to break free, and transfer out from this store. Playing the waiting game.

---

**asserted statement of material fact that uses the term "denied as stated" is permitted**.") (emphasis in original). The Court will address Plaintiff's hearsay argument *infra* in the Analysis section.

Customers constantly are telling me how "rude," "mean" and "ornery" this worker is to them, and our team scores suffer, and bonus too therefore in the end with her on board.

As it was told to me, the week of November 1-5, Manager Sherry was putting her feet up on the desk, joking that she was going to chill for her shift. Elaine spoke right up in front of her and other witnesses, and stated "That would be no different that [sic] what any other manager does around this place." As one of those fellow managers, I was highly offended, as I hardly ever catch a breath. But Elaine knew as she is tight with Sherry that there would be no consequences for such trash talk, and therefore was protected by her ill speech.

Everyone dances on egg shells around this lady, and I can no longer turn the other cheek and ignore such a despicable attitude killing this stores morale. Please HELP US, and stop this hostile working environment once and for all!

(*Id.* at ¶ 25).[9]

Because the 2022 Hotline Complaint was anonymous, Stacy Alleman ("Alleman"), Sheetz's Employee Relations Supervisor, is not aware of the individual who made that complaint. (*Id.* at ¶ 26). As a result of the 2022 Hotline Complaint, Sheetz investigated the allegations contained in the complaint. (*Id.* at ¶ 27). As part of its investigation, Sheetz collected statements from Tingley and three other employees. (*Id.* at ¶ 28). The statements provided by other employees indicated that:

---

[9]     Plaintiff denies this statement "as stated," and further claims the facts alleged in the paragraph are based upon hearsay and may not be considered on summary judgment. (PSOMF ¶ 25). As set forth in the Scheduling Order, this is an improper statement. (*See* Doc. 11 at 4 n.1) ("If a party files a motion for summary judgment, the only permitted responses by the non-moving party to the moving party's statement of material facts are: "admitted", "denied", or "admitted in part and denied in part. **No response by the non-moving party to a movant's statement of material fact which purports to be a denial of an asserted statement of material fact that uses the term "denied as stated" is permitted**.") (emphasis in original). The Court will address Plaintiff's hearsay argument *infra* in the Analysis section.

a.  Tingley was "constantly rude to customers and treats some employees and customers like they are stupid," and "she always claims every other shift doesn't work but she'll refuse to help anywhere or anyone unless it is filling toilet paper in the women's room or helping with the line."

b.  Tingley would "become[] argumentative about other shifts not doing anything," and "degrade[] peoples inteligense [sic] on how much they know about their jobs."

c.  Tingley had spoken negatively about other employees on several occasions and, in front of customers, had complained to another employee that management does not train anyone "up front."

(*Id.* at ¶¶ 29(a)-(c)).[10]  As a result of the investigation, Alleman determined that Tingley had violated the Professionalism and Respect policy through her statements about employees to other employees and her attitude towards customers, and Alleman made the decision to issue Tingley discipline.  (*Id.* at ¶ 31).  Because Tingley had no discipline issued to her in the year prior, she was issued a Strive coaching.[11]  (*Id.* at ¶ 32).  District Manager Jessica Sowansky ("Sowansky") issued the Strive coaching to Tingley on November 17, 2022, and,

---

[10]     Plaintiff admits these statements of facts.  (PSOMF at ¶ 29).  However, Plaintiff notes that "someone appears to have made an opinion-based statement about plaintiff's alleged behavior.  The statement is a generalization and lacks reference to any specific example or time frame.  An employee did not state what is quoted.  By way of further answer, these statements are hearsay and may not be considered for purposes of summary judgment."  (*Id.*).

[11]     Although Plaintiff admits this statement of fact, (PSOMF at ¶ 32), she notes that "plaintiff testified she never heard of Strive coaching."  (*Id.*).

in this coaching conversation, instructed Tingley to remain professional at all times, to keep a positive attitude with team members and customers regardless of personal feelings, and to take issues to management to address rather than discussing with other team members.[12] (*Id.* at ¶ 33). Tingley did not complain about the November 17, 2022, Strive coaching or feel that it was discriminatory. (*Id.* at ¶ 34).

Less than three months later, on or about February 6, 2023, Sheetz received a second anonymous complaint regarding Tingley through its employee hotline ("2023 Hotline Complaint").[13] (*Id.* at ¶ 35). According to Defendant, the 2023 Hotline Complaint indicated that the general nature of the complaint was "[r]acist behavior, bigotry, Politics, etc." (*Id.* at ¶ 36). Although Plaintiff denies the foregoing statement of material fact, she admits that the unknown declarant used the phrase "[r]acist chatter and bigotry" to describe what was said, and further states that "none of those facts contained in the anonymous complaint points to racist behavior." (PSOMF at ¶ 36). Nevertheless, the parties agree that the complainant who made the 2023 Hotline Complaint reported:

> A week and a half ago, I had an open discussion with Elaine, that I had just previously done my "biased" training that was just rolled out. She rolled her eyes, and said "It was a joke" and that "it's a waste of time, she will not abide by it." I was going to let those statements go, but then I remembered in my training I answered that I would report a coworker who was being biased, and that is def this woman!

---

[12]     Although Plaintiff denies this statement of fact, (PSOMF at ¶ 33), she merely notes that "[t]he Sowansky Declaration is undated, unsigned, and should be stricken from the record." (*Id.*) Defendant promptly corrected this error, and before the Court is now a signed, dated, and sworn to Sowansky Declaration. (Doc. 27). This fact will be deemed admitted.

[13]     Plaintiff admits this statement of fact, but states that "the statements are hearsay and may not be considered for the purposes of summary judgment." (PSOMF at ¶ 35).

> The final straw for me, was last week, a grumpy elderly man in a MAGA hat came in, and Elaine and him engaged in talking politics in front of myself and numerous other customers out loud without a care in the world who heard them.  She said aloud, that "all the immigrants coming into this country, taking all the jobs makes her sick."  She also shockingly compared "the black lives matter movement to the holocaust."  All while she was waiting on two teenage girls using an EBT card, who were amazed, I went right over and appologised [sic] for her behavior to them and just told them, "she has no filter!"  Talk about being embarrassed.  I was appalled to hear that statement alone! []  I was so upset I walked away shaking.  She has said previously to me how "The democrats are ruining this country" more than once.  No one needs to come to work and listen to this kind of rhetoric!  This company shoves down our throats about family values, and teamwork, and openness to all types, how does this woman have a job after all these years?  It's not even like this behavior is a secret to anyone on staff!  It is common knowledge.  That is the saddest part!  Most people avoid her like the plague, but she does have her supporters.  You have a top tier assistant in this store, writing comments on her birthday plaque hanging on the office door, "thanking her for always keeping it real."  Like Seriously??  REAL?  Seeing people cheer this woman's behavior on makes me sick.  I'm sorry.  My spouse told me to ask for a transfer to a different location, and I may consider it even if I must drive farther out of my way!  Racist chatter, and bigotry, when you have African American employees, and employees with black husbands is just plain uncalled for!

(SOMF at ¶ 37).  Because the 2023 Hotline Complaint was anonymous, Alleman is not

aware of the individual who made the complaint.  (*Id.* at ¶ 38).

As a result of the 2023 Hotline Complaint, Sheetz investigated the allegations

contained in the complaint.  (*Id.* at ¶ 39).  As part of its investigation, Sheetz collected

statements from Tingley and other employees.  (*Id.* at ¶ 40).  According to Defendant, and

disputed by the Plaintiff, the statement provided by other employees indicated that:

    a.   Tingley was rude to employees and customers, made unfounded accusations about other employees, and told a customer "tough, call your bank" after the customer's card was declined.

b.  Tingley had made racial and political comments to customers and employees, and had treated customers of other races differently, including changing her tone of voice and making customers feel uncomfortable (which was apparent on the customers' facial expressions and body language).

c.  Tingley discussed politics with customers, including telling a customer that "the Democrats are what is wrong with this country" and making comments about "the Chinese" and Russia.  Tingley also attempted to talk to other employees about politics as well.

d.  Tingley talked about politics with a customer on two separate occasions over a span of two months, discussing "how demacrats [sic] let all illegals in and give them and all young people foodstamps [sic] and everything free."  Tingley made these comments in front of other customers who were paying for their items with food stamps.  Tingley also discussed with a customer that "Biden is letting China take over USA and anyone who doesnt [sic] see that is an idiot," that Biden was helping China, and that Covid was made up.

e.  Tingley said that "Black people and other races are sucking the life out of USA and get everything for free," compared the Holocaust to slavery, stated that the Black Lives Matter movement should be stopped at once, and was against interracial marriage.  Tingley also stated to another employee that the Managing

Bias training was "a crock of shit," that she was not a "snowflake," and that "people need to get it together" because "that's why USA is the way it is."

f.   Another employee reported to Store Manager Phillips that Tingley was discussing politics with a customer, and Phillips instructed Tingley that she should not be having those types of conversation in the store because people could be easily offended.

g.   Tingley treated minority customers like that they were "beneath her" by being "very short, quick to dismiss, dirty looks, glaring at them."  Tingley also made references to the EBT customers (EBT is colloquially known as food stamps), stating things like "[a]nother free ride on uncle Joe [Biden]," and told customers and other employees that "[t]he Democrats who voted for [President Biden] deserve everything they get."

h.   Tingley had upset another coworker on numerous occasions over her "sick banter."

i.   Tingley had been "incredibly rude" to other employees and customers on multiple occasions, leaving other employees visibly upset.

j.   Tingley used the term "illegals" instead of immigrants, which upset other employees and turned into an argument about race.

k.   An employee also heard Tingley use derogatory terms on other occasions when referring to someone of a different ethnicity.

l.  Tingley would get "boiling mad" when a customer would ask to break a bill for smaller change, and at times would tell customers that "there is a bank across the street" or make customers purchase an item to break change.

m.  Tingley reprimanded another employee for using "her" register while Tingley was on break, despite the fact that a manager had instructed the employee to use that register.  Tingley also got angry at the same employee on a different occasion after the employee placed Tingley's walkie on the headset stand at the register while Tingley was on break.  Tingley spoke to this employee in a disrespectful and unprofessional manner on both occasions.

n.  Tingley treated people who did not hear well or did not speak perfect English in a disrespectful and rude manner, acted as if she was bothered or annoyed by customers' questions, and used an unprofessional tone when speaking to customers.

(SOMF at ¶¶ 41(a)-(n)).  As noted, Plaintiff disputes all the preceding statements of fact, and directs the Court to the parts of the record that she suggests contradicts Sheetz's findings regarding the 2023 Hotline Complaint.  (PSOMF at ¶ 41).

Nearly all of the statements collected in the investigation into the 2023 Hotline Complaint reported concerning behavior by Tingley towards other employees, customers, or

both.[14]  (SOMF at ¶ 42).  In her statement, Tingley admitted that she discussed politics while at work.[15]  (*Id.* at ¶ 43).  Tingley denied making racial comments and disparaging comments about the Managing Bias training in her statement.  (*Id.* at ¶ 44).  However, through the multiple statements referenced in paragraph 42 above that Sheetz collected as a part of the investigation, Alleman was able to corroborate that Tingley had inappropriately made racial and political comments at work, including disparaging comments about African-Americans and the Black Lives Matter movement, and that multiple employees reported that Tingley was treating minority customers differently.  (*Id.* at ¶ 45).  Because Alleman was able to corroborate that Tingley made inappropriate political and racial comments at work and that multiple employees reported that Tingley was treating minority customers differently, Alleman determined that Tingley had violated Sheetz's Harassment and Discrimination and Professionalism and Respect policies.[16]  (*Id.* at ¶ 46).

As a result of the policy violations, the nature of the statements at issue, and Tingley's pattern of inappropriate and unprofessional behavior (as recently indicated by the Strive coaching issued to Tingley in November 2022), Alleman made the decision to

---

[14]    Plaintiff states that "[i]t is admitted that the declaration of Ms. Alleman at paragraph 36 contains the referenced statement.  However, the conclusory statement of Ms. Alleman is not a material fact."  (PSOMF at ¶ 42).

[15]    Although Plaintiff admits this statement, she notes that Ms. Alleman admitted in her deposition that Sheetz does not have a policy that prohibits employees from talking about politics.  (PSOMF at ¶ 43).

[16]    Plaintiff admits "that Alleman's declaration supports the conclusory statements contained in paragraphs 46-50.  The statements are not material facts."  (PSOMF at ¶¶ 46-50).

terminate Tingley's employment. (*Id.* at ¶ 47). In making that decision, Alleman consulted with her supervisor, Lainie Snider, and District Manager Sowansky, but Alleman was the ultimate decisionmaker. (*Id.* at ¶ 48). Phillips did not make the decision to terminate Tingley's employment. (*Id.* at ¶ 49). Alleman does not work at Sheetz Store #363, but works out of the Sheetz Operations Support Center located in Claysburg, Pennsylvania. (*Id.* at ¶ 50). Alleman was not aware of Tingley's age at any time prior to Tingley's termination.[17] (*Id.* at ¶ 51). The parties dispute whether Tingley's age was discussed or considered with respect to the decision to terminate her employment. (*Id.* at ¶ 52); (PSOMF at ¶ 52). Pursuant to Sheetz practice, while Phillips was not the decisionmaker, Phillips conveyed the termination decision to Tingley because she was the Store Manager. (SOMF at ¶ 53).

Sheetz did not hire any specific individual to fill Tingley's position after her termination. (*Id.* at ¶ 54). When Sheetz loses a part-time employee like Tingley, Sheetz does not specifically hire to replace that part-time position. (*Id.* at ¶ 55). Sheetz hired twenty-five (25) employees in various roles to work at Sheetz Store #363 in the six months following Tingley's termination.[18] (*Id.* at ¶ 56). While a Supervisor would not have explicitly replaced Tingley's position, the Supervisors are expected to perform tasks that were

---

[17]    Plaintiff admits "that Alleman claims she was not aware of Tingley's age prior to Tingley's termination." (PSOMF at ¶ 51).

[18]    Plaintiff denies this fact "as stated." (PSOMF at ¶ 56). As discussed, however, this is not a proper response and will be deemed admitted.

required of Tingley as a Cashier/Salesperson at times, including completing transactions on the cash register and stocking certain items in the vicinity of the cash register. (*Id.* at ¶ 57). Store Team Member and Salesperson are different names for the same position at Sheetz stores, and perform the same duties, including completing transactions on the cash register and stocking certain items in the vicinity of the cash register. (*Id.* at ¶ 58).

Of the employees hired to work at Sheetz Store #363 in the six months following Tingley's termination, twenty-two (22) were Store Team Member employees and three (3) were Supervisors, with ages ranging from approximately 17 to 67 years of age. (*Id.* at ¶ 59). The ages of the 22 Store Team Members hired to work at Store #363 in the six months following Tingley's termination ranged from approximately 17 to 41 years of age. (*Id.* at ¶ 60). The ages of the 3 Supervisors hired to work at Store #363 in the six months following Tingley's termination ranged from approximately 27 to 67 years of age. (*Id.* at ¶ 61). The first individual Sheetz hired after Tingley's termination was a Supervisor who was approximately 67 years of age at the time of hire, and this individual was hired within two days of Tingley's termination.[19] (*Id.* at ¶ 62).

Tingley is not aware of any individual who was hired to replace her position at Store #363. (*Id.* at ¶ 63). Alleman had no input into hiring decisions made at Sheetz Store #363 after Tingley's termination. (*Id.* at ¶ 64). Tingley was 66 years of age when she was hired

---

[19]    Plaintiff admits these statements of fact, but notes that these statements "are not material, as the 67-year-old was a supervisor and not plaintiff's replacement." (PSOMF at ¶ 62).

to work at Sheetz. (*Id.* at ¶ 65). She was 72 years of age when she was terminated from her employment with Sheetz. (*Id.* at ¶ 66). Tingley did not tell anyone in Employee Relations, her Store Manager, or her District Manager her age, and Tingley is not aware of anyone ever searching for her age in Sheetz's internal records. (*Id.* at ¶ 67). Tingley never complained of discrimination during her employment with Sheetz. (*Id.* at ¶ 68).

## II.    STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct.

3177, 111 L.Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

> When opposing parties tell two different stories, one of which is blatantly
> contradicted by the record, so that no reasonable jury could believe it, a court
> should not adopt that version of the facts for purposes of ruling on a motion for
> summary judgment.

*Id.* (internal quotations, citations, and alterations omitted). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## III.    ANALYSIS

Defendant Sheetz seeks summary judgment on Plaintiff's claims alleging age discrimination in violation of the ADEA and PHRA. ADEA and PHRA claims are analyzed under the same standard. *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010). Accordingly, the Court will generally reference only the ADEA in this memorandum opinion. The parties agree that where, as here, there is no direct evidence of discrimination, the Court analyzes Plaintiff's claim under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). (*See* Docs. 20 at 3, 26 at 7-8).

Under *McDonnell Douglas*, the plaintiff bears the initial burden of showing a *prima facie* case of discrimination. Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to identify a legitimate non-discriminatory reason for the adverse employment action." *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009). Once a

defendant offers a legitimate non-discriminatory reason, "the burden of production [shifts]

back to the plaintiff to provide evidence from which a factfinder could reasonably infer that

the employer's proffered justification is merely a pretext for discrimination." *Burton v.*

*Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). To survive summary judgment, "the plaintiff

must point to some evidence, direct or circumstantial, from which a factfinder could

reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe

that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d

Cir. 1994).

### A. *Prima Facie* Case of Age Discrimination

To survive summary judgment, it is initially Tingley's burden to establish a *prima*

*facie* case of age discrimination in violation of the ADEA. "The elements of a *prima facie*

case of age discrimination are that: (1) the plaintiff is at least forty years old; (2) the plaintiff

suffered an adverse employment decision; (3) the plaintiff was qualified for the position in

question; and (4) the plaintiff was ultimately replaced by another employee who was

sufficiently younger so as to support an inference of a discriminatory motive." *Willis v.*

*UPMC Childrens Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing *Burton*, 707

F.3d at 426)). "Where the plaintiff is not directly replaced, the fourth element is satisfied if

the plaintiff can provide facts which, if otherwise unexplained, are more likely than not based

on the consideration of impermissible factors." *Id.* (internal citation and quotation marks

omitted).  The Third Circuit "has indicated the *prima face* case is not intended to be rigid, mechanized, or ritualistic."  *Id.* (internal citation and quotation marks omitted).

Defendant Sheetz does not dispute that Plaintiff has established the first three prongs of the *prima facie* case, nor could it:  Tingley was over the age of 40, was subject to an adverse employment action, and was qualified for her position as Store Team Member (Cashier/Salesperson).  (Doc. 20 at 5-7).  Defendant does, however, dispute that Plaintiff has established a *prima facie* case of age discrimination under the ADEA because there is no proof that Sheetz's took the adverse employment action because of Tingley's age.  (*Id.*).  Specifically, Defendant claims that "Tingley cannot establish a *prima facie* case of age discrimination because she cannot show that there was an inference of a discriminatory motive with respect to her termination and replacement with a younger individual."  (*Id.* at 5).  Put another way, Defendant claims that Plaintiff "cannot point to any specific individual who was hired to replace her, or any evidence supporting an inference that Sheetz considered Tingley's age in its termination decision" and thus cannot establish a *prima facie* case of age discrimination.  (*Id.* at 7).

Plaintiff, in contrast, calls Defendant arguments "completely disingenuous."  (Doc. 26 at 8).  More specifically, Plaintiff claims that:

> Finally, defendant makes the completely disingenuous argument that Ms. Tingley was not replaced by a sufficiently younger person to support an inference of discriminatory animus and hence fails to prove a prima facie case.  The argument appears to be that plaintiff does not know the name of her replacement.  In its Answer to Plaintiff's Complaint defendant admitted it hired store team members younger than plaintiff after her termination.  Defendant's FRCP 30(b)(6) witness testified that exhibit 2, a copy of

which is attached hereto, was a complete list of every person hired in the six months following plaintiff's termination. Plaintiff was employed by defendant as a Store Team Member. In the six months following plaintiff's termination, Sheetz, Inc. hired 25 people at the Clarks Summit location where plaintiff worked. Twenty-two of the 25 were Store Team Members and three were supervisors. Of the 22 Store Team Members hired, the oldest was 32 years younger than plaintiff. Plaintiff's position was filled by a person sufficiently younger than plaintiff to support an inference of discriminatory animus. Plaintiffs position was not filled by a supervisor, or not filled at all, as defendant argues.

(*Id.* at 8-9).

A review of the factual record supports Plaintiff's assertion. Specifically, it is undisputed that in the six month's following Plaintiff's termination as Store Team Member, all twenty-two persons hired as Store Team Members at Store #363 were significantly younger than Plaintiff. Indeed, the oldest person hired by Defendant for this position was thirty-two years younger than Plaintiff. (Doc. 25 at ¶ 54); (Doc. 26-1). Although Defendant claims that no one person replaced Tingley, the record makes clear that every person hired by Defendant at Store #363 as a Store Team Member in the six-month period following Plaintiff's termination was at least thirty-two years younger than Plaintiff. (*Id.*). Accordingly, Plaintiff has satisfied her burden to establish a *prima facie* case of age discrimination. A factfinder could reasonably infer that the Plaintiff "was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." *Willis*, 808 F.3d at 644.

## B. Legitimate Non-Discriminatory Reason for Termination

As discussed, Tingley has established a *prima facie* case of age discrimination. The burden of production now shifts to Defendant to establish a legitimate, non-discriminatory reason for the adverse employment action. "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment actions for a non-discriminatory reason." *Burton*, 707 F.3d at 426 (internal citation and quotation marks omitted).

According to Defendant, Tingley was terminated after Sheetz determined that she violated multiple company policies through her interactions with customer and employees. (Doc. 20 at 1). More specifically, Sheetz received two hotline complaints regarding Tingley's behavior and comments towards customers and employees, investigated those complaints, and ultimately concluded that Tingley had made inappropriate racial and political comments. (*Id.*). Plaintiff disputes this, noting that the hotline complaints and certain statements "are insignificant, they are conclusory, they so lack factual support that the defendant has failed to meet the modest burden of articulating a legitimate non-discriminatory reason for the termination." (Doc. 26 at 10). Plaintiff further claims that these statements are hearsay and cannot be considered at summary judgment.

Although Stacy Alleman testified that Sheetz's policies do not expressly prohibit political comments from its employees, (Doc. 25-2 at 42:8-16), the record contains evidence supporting Sheetz's finding that Tingley violated various policies, including by making racial

and inappropriate comments to employees and customers.[20]  At her deposition, Tingley

denied that she made racial or otherwise inappropriate comments.  (Doc. 25-1 at 114:21-

116:15; 127:10-22; 137:2-139:2; 143:6-144:19; 162:23-163:5).  Nevertheless, on this record

the Court finds that a factfinder could reasonably infer that Defendant terminated Tingley for

violations of Sheetz's policies for racial and inappropriate comments to customers and

fellow employees.  Because Defendant has offered a legitimate, nondiscriminatory rationale

for terminating Tingley, the burden now shifts back to Plaintiff to show that these reasons

were a pretext for age discrimination.

## C. Pretext for Age Discrimination

The Court has already determined that, viewing the evidence in the light most

favorable to the non-moving party, a reasonable factfinder could conclude that Plaintiff and

Defendant have discharged their initial burdens under *McDonnell Douglas.*  At this stage,

"the burden of production [shifts] back to plaintiff to provide evidence from which a factfinder

could reasonably infer that the employer's proffered justification is merely a pretext for

discrimination."  *Burton*, 707 F.3d at 426.  Thus, the central issue on summary judgment is

---

[20]     Although Plaintiff objects to these facts, stating they are hearsay which cannot be relied on at the
summary judgment stage, the Court disagrees.  As Defendant notes, "the averments included in the hotline
complaints and the statements collected as part of the investigation are not hearsay, as they are not being
offered for the truth of the matter asserted, but rather to show what Alleman considered in reaching her
decision to terminate Tingley." (Doc. 29 at 6-7).  The Court largely agrees with Defendant and will not
consider these statements for the truth of the matters asserted. *See Larochelle v. Wilmac Corp.*, 769 F.
App'x 57, 65 (3d Cir. 2019) ("Rather, because Defendants offered these statements to explain why they
terminated [plaintiff], that is, for the statements' effect on the listener—those statements were not offered
for their truth.  Therefore, they are admissible for a non-hearsay purpose.") (internal citations, quotation
marks, and alternations omitted) (citing *United States v. Edwards*, 792 F.3d 355, 357 n.2 (3d Cir. 2015)).

whether Plaintiff has pointed "to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. "The plaintiff is . . . not required to produce direct evidence of discriminatory intent to demonstrate pretext and survive a motion for summary judgment." *Burton*, 707 F.3d at 427.

The Court concludes that Plaintiff has proffered sufficient evidence to create a triable and genuine dispute of material fact with respect to whether Defendant's articulated justification for Plaintiff's termination was merely a pretext for age discrimination. Viewing the facts and every inference from those facts in the light most favorable to the Plaintiff, there is sufficient evidence for a reasonable factfinder to discredit Defendant's proffered justification for terminating Tingley's employment and that her age was more likely than not a but for cause of Tingley's termination.

Specifically, Tingley testified repeatedly, under oath, that she did not make any racist or objectionable comments while at work or engaged in any of the alleged conduct that resulted in her termination. (Doc. 25-1 at 114:21-116:15; 127:10-22; 137:2-139:2; 143:6-144:19; 162:23-163:5). Although Tingley did testify that she discussed politics while at work, (*Id.* at 113:15-114:14, 122:24-123:5; 125:23-127:22), the deposition of Sheetz's Employee Relations Supervisor Stacy Alleman indicates that discussing politics at work was not *per se* against Sheetz's policies. (Doc. 25-2 at 42:8-16). Moreover, over the course of

her nearly seven-year employment with Defendant, Plaintiff received performance reviews indicating she was a "Respected Performer," meaning that that she "meets expectations and demonstrates the behaviors we value most at Sheetz."[21]  (Doc. 22-3 at 14-15).  Indeed, in her last performance review just months before her termination, Plaintiff's Store Manager indicated that she was a "Respected Performer."  (*Id.*).

In addition, in the six months following Tingley's termination, every single person Defendant Sheetz hired at Store #363 in the position of Store Team Member (Cashier/Salesperson) was significantly younger than Plaintiff.  (Doc. 25 at ¶ 54); (Doc. 26-1).  In fact, the oldest person hired at Store #363 as Store Team Member in the six months following Tingley's termination was thirty-two years younger than Plaintiff.  (*Id.*).  Although Defendant raises several arguments to support its motion that Plaintiff cannot prove pretext, it is not for the Court on summary judgment to weigh the evidence and assess the credibility of the parties.  That is for the factfinder to decide.  Accordingly, Defendant's motion for summary judgment will be denied.

---

[21]    According to Sheetz's performance rating guidelines, a "Respected Performer":  (1) achieves substantial outcomes on business area metrics/scorecards/criteria that have a positive impact on the team or organization; (2) consistently meets goals and objectives; (3) demonstrates commitments to Sheetz's success; follows through on responsibilities and willingly accepts responsibility for one's actions; (4) demonstrates technical competence and skills relevant for role/area; (5) works well with others; acts on opportunities to help others; prioritizes the team over self; adopts a big picture perspective; (6) operates with a clear customer focus; ensures performance will meet customer needs; (7) recognizes and acts on opportunities to ensure the quality of our products, services, processes and/or customer experiences; (8) is open to improving performance, receiving feedback, and accepts additional assignments and/or responsibilities; and (9) displays the DNA in their day to day work.  (Doc. 22-3 at 14).

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, (Doc. 19), will

be denied.  A separate Order follows.

_____
Robert D. Mariani
United States District Judge